**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John A. BLAIR et al., Defendants-**
**Appellants.**

No. 29916
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

June 28, 1972.

Rehearings Denied Aug. 1, and
Nov. 10, 1972.

Certiorari Denied March 26, 1973.
See 93 S.Ct. 1536.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Milton E. Grusmark, Miami Beach, Fla., for Crews and Court appointed for Blair.

Fred A. Jones, Jr., Miami, Fla., Court appointed for Harrell.

Samuel S. Forman, Miami, Fla., Court appointed for Dunn.

Robert W. Rust, U. S. Atty., J. Daniel Ennis, Miami, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case is another "entangled web of human miscreancy and judicial error." [1] The defendants were apparently apprehended "red-handed" in the act of purloining mail from a United States Post Office, two of the defense counsel were disbarred, the interrogating Postal Inspector, in violation of the express mandates of *Miranda*, persisted in questioning one defendant for more than an hour after the suspect had expressly re-

1. Cf. United States v. Bell and Beasley, 5 Cir., 1972, 457 F.2d 1231.

quested presence of counsel before surrendering his Fifth Amendment rights, one Government Attorney has filed a brief in this Court containing an unfortunately misleading statement of fact, the District Clerk has not supplemented the master jury wheel with names of newly registered voters purportedly in violation of the District's Plan, and even the District Court has been pushed, been pulled or fallen into judicial error, since he inadvertently, but nonetheless in violation of Rule 11, F.R.Crim.P., neglected to assure that the record explicitly reflects that he informed one defendant of the maximum penalty which could result from his plea of nolo contendere or to ascertain whether or not his plea was the result of any inducements or promises of leniency. The net result of all this confusion is that we must vacate the convictions of two of the defendants and remand their cases for a new trial or rearraignment, although we affirm the other two convictions.

### JURY SELECTION

■ The first issue in this appeal, and the only one urged by all defendants, is the contention that the failure of the District Clerk to supplement the master jury wheel with names randomly selected from among persons who registered to vote subsequent to the initial filling of the master jury wheel violated the Plan of the United States District Court for the Southern District of Florida for the Random Selection of Grand and Petit Jurors (Plan). The effect of this alleged non-compliance is said to be a disenfranchisement of certain young persons (namely 21 and 22 year olds) from the statutory right[2] to serve on juries and a denial of defendants' rights to be indicted and tried by a jury fairly representative of the community.

Unlike the defendants in United States v. Kuhn,[3] these defendants do not attack the validity of the Plan, but rather they urge that the District Clerk, who, pursuant to the Plan, manages the jury selection process under the supervision and control of the Chief Judge of the District, has not *complied* with the Plan's affirmative provision that the master jury wheel be "supplemented by the inclusion of subsequent registrants *to the latest practicable date.*" (Emphasis added.) The proof offered by the defendants shows that subsequent voter registration lists are available on a monthly basis, but that the District

---

2. Conferred by the Jury Selection and Service Act of 1968, 28 U.S.C.A. § 1861 et seq. See also, Senate Rept. 891, 90th Cong., 1st Sess.; House Rept. 1076, 90th Cong., 2d Sess., U.S.Code Cong. & Admin.News, 1968, p. 1792. Guidelines of the Committee on the Operation of the Jury System of the Judicial Conference of the United States; Gewin, The Jury Selection and Service Act of 1968, 20 Mercer L.Rev. 349 (1969).

3. 5 Cir., 441 F.2d 179. In *Kuhn*, the defendants challenged the provision of the Plan which called for purging and refilling of the master jury wheel only once every five years. The argument was that newly registered voters would have to wait for up to five years before having an opportunity to serve on juries and that the practical effect of this provision would, in the fifth year after filling, produce a situation in which no one less than 25 years old could possibly serve on any jury. This situation was alleged to violate § 1861 of the Act and therefore render the Plan invalid.

This Court merely held that the Plan was valid under the Act and that the Clerk had complied with the Plan. That determination left the defendants in the position of having to rest their argument of disenfranchisement of young persons on a constitutional, rather than a statutory, basis. They were unable to make the requisite showing to vindicate their position on constitutional grounds.

In the present case, the defendants do not attack the Plan's compliance with the Act, but rather the Clerk's compliance with the Plan. Thus, *Kuhn* does not dispose of the case.

It might be noted here that the alleged inherent defect involved in *Kuhn* has been cured, in large part, by Pub.L. No. 92–269, 86 Stat. 117 (April 6, 1972) which lowered the minimum age for qualification for Federal jury service to eighteen years and mandates that each master wheel be emptied and refilled by September 1, 1973, and no less often than each four years thereafter.

Clerk has not supplemented the master jury wheel with names selected from among newly-registered voters, with the alleged result that no 21 year old could possibly serve on a grand or petit jury empanelled at the time the defendants were indicted.

The assertion that the Clerk failed to comply with the Plan fails since *what* the Plan requires to be supplemented is not the Master Jury Wheel, but the voter registration lists.[4]

This is demonstrated not only by the purpose, location and sentence structure of the disputed phrase, but also by the structure of the Plan, the terms of the Act, its legislative history, and the guidelines formulated by the Judicial Conference of the United States primarily through the Conference Committee on the Operation of the Jury System.[5]

The Plan is structured for four nonstatutory divisions one of which is Miami with which we are concerned. It calls for a very large number of names for each of the master wheels.[6]

Large numbers are called for not only to assure a fair cross section in the heavily populated Miami metropolitan area, but to afford a sufficient number out of which names could be drawn for the qualified wheel to meet the forecasted needs for both Grand and Petit jurors without the necessity of adding new names to the master wheel. The Kaufman Committee guidelines promulgated at the express direction of the Judicial Conference [7] emphasized the importance of this flexibility. The Committee specifically used terms which envisaged that once the Master Wheel was filled, nothing would be added to it until the specified periodic emptying-refilling.[8]

---

4. Both the initial Plan (Sept. 1968) and the Amended Plan (April 1971) in Paragraph IV state as follows: "This Plan is based on the conclusion and judgment that the policy, purpose and intent of the Jury Selection and Service Act of 1968 will be fully accomplished and implemented by the *use of voter registration lists, as supplemented by the inclusion of subsequent registrants to the latest practicable date*, as the source of a random selection of prospective grand and petit jurors who represent a fair cross-section of the community. This determination is supported by all the information this Court has been able to obtain after diligent effort on its part and after full consultation with the Fifth Circuit Jury Working Committee * and the Judicial Council of the Fifth Circuit. (emphasis added)

    * The operation of the Jury Working Committee, the Council and Reviewing Panel is described in Gewin, The Jury Selection and Service Act of 1968, 20 Mercer L.Rev. 349 (1969).

5. It is commonly referred to as the Kaufman Committee because of the dynamic leadership of its Chairman, Judge Irving Kaufman of the Second Circuit.

6. The number required is as follows:

| Division | 1968 Plan | 1971 Plan |
|---|---|---|
| Miami | 45,000 | 70,000 |
| West Palm Beach | 4,500 | 8,000 |
| Fort Pierce | 3,000 | 5,000 |
| Key West | 3,000 | 5,000 |

7. The Judicial Conference is expressly authorized to adopt rules and regulations governing the provisions and operation of Plans formulated under the Act. 28 U.S.C.A. § 1863.

8. Under Part A—Threshold Questions to Be Answered subpart 5—"How many names will be selected at random from the voter lists?" the Guidelines stated as follows: "In determining how many names to select from the voter lists three factors must be considered: (1) The time period for which these names are to last. The Act requires the plan to fix the times when the master jury wheel must be emptied and refilled. In most cases it is anticipated this will be every 2 or 4 years. The master jury wheel will then be filled once to last this entire period.* (2) The number of jurors needed during this time period. An estimate of this figure can be made from past experience. (3) The number of persons whose names are selected from the voter lists who it is anticipated will ultimately serve as jurors and not be disqualified, excused, exempt, excluded, or fail to respond to the jury qualification form and the summons. The experiences of a few courts which have recently converted to random selection from voter lists indicate that approximately half of those whose names are picked from the voter lists will be eliminated in one way or another. Accordingly, about twice as many names must be placed in the master jury wheel as are needed as jurors

■■ In the structure of the Plan, unlike the precise outline to be followed in filling the Master Wheel (initially and on subsequent emptying/refilling)[9] there was no mechanism prescribed for adding new names in the interim. As the Act permits, (28 U.S.C.A. § 1863(b)(4)) the Plan merely provided that the Court "may order additional names to be placed in the Master Wheels from time to time as necessary".

Thus, those responsible for the penetrating nationwide study and formulation of guidelines, the Judges of the Southern District of Florida, and the Reviewing Panel of the Fifth Circuit contemplated that once filled with a number more than adequate to meet forecasted needs, no new names would be added except in the exigent circumstances "as necessary". In exercising our judicial function in interpreting what is inescapably our own creature the Plan should be interpreted in the light of, and to achieve, these objectives. This is entirely in keeping with the Act since it expressly provided that the ". . . Plan shall provide for periodic emptying and refilling of the master jury wheel at specified times" 28 U.S.C.A. § 1863(b)(4). Congress necessarily contemplated that for a substantial period of time the Master Wheel would be static. This meant that during this period persons becoming potentially eligible for jury service would be excluded. Conversely it meant that there was no requirement that the Plan call for continuous updating. In the Constitutional—statutory goal of a fair cross section Congress had the right to consider practical problems of administrative necessity.[10]

The disputed clause (note 4 *supra*) is not a part of the mechanism prescribed for filling or refilling. On the contrary, it is a part of the Court's (and Reviewing Panel's) determination as mandated

during the period before the master jury wheel is emptied and refilled. It may be desirable to place even more names in the master jury wheel as a *safeguard against running out of names*."

\* At this point footnote 27 gave added emphasis: "In the event that not enough names were placed initially in the master jury wheel, additional names can be added from time to time as necessary. It may be burdensome to do so, however, because of the necessity of again obtaining the voter lists and making a random selection. Thus it is desirable initially to place sufficient names in the master jury wheel."

In the Committee report of the October 1969 Judicial Conference (pp. 18–21) the Subcommittee on Effects Utilization of Jurors rejected the proposal of numerous Judges to eliminate the Master Wheel primarily for the reasons stated by Judge Kaufman's letter response: "[the Committee] concluded that a variety of valid reasons compelled the use of both master and qualified jury wheels in the jury selection process. Among those reasons, I might mention: 2. The need for pragmatism. In most districts across the country, voter lists are kept in various locations within the district, in varying degrees of neatness.

Some voter lists are computerized, others are simply dusty old volumes. Thus the process of selecting names from the voter lists is an arduous one, as many court clerks informed us when we were preparing the Act. We wished to minimize this tedious task by requiring it to be performed as infrequently as possible. *Thus once the names are selected for the master wheel, the voter lists need not be resorted to again until it is time to empty the wheel as provided for in § 1863(b)(4). In most cases, this will be once every four years.*" (emphasis added)

9. The 1968 Plan provided that "each master jury wheel shall be emptied and refilled during the period July 1—November 30, 1971, and during said period of each fifth year thereafter." The 1971 Amended Plan changed the dates to June 1—December 22, 1972, and the periodic emptying/refilling every four years thereafter.

10. It did so again for 18 year olds (see note 5 *supra*) by extending to September 1, 1973, the time for emptying/refilling. See Duncan v. United States, 9 Cir., 1972, 456 F.2d 1401; United States v. Guzman, S.D.N.Y.1972, 337 F.Supp. 140.

by the Act (§ 1863(a)) that the Plan is "designed to" and will "achieve the objectives of sections 1861 and 1862" for random selection of jurors from a fair cross section, equal opportunity for jury service and avoidance of discrimination by reason of race, color, sex, religion, national origin or economic status.

Behind this was, of course, the congressional determination that goals could best be attained through the use of voter lists (§ 1869(c), (d)).

Only where necessary to "foster the policy and protect the rights secured by Sections 1861 and 1862 . . ." § 1863(b)(2) are other sources of names to be used. This is the supplementing spoken of.[11]

In the structure of the Plan interpreted to achieve the objections described, the supplementing (see note 4 *supra*) is to the voter registration lists, not to the Master Wheel. In other words, the whole Plan declares that voter registration lists are a completely adequate source for random selection with but one qualification. That qualification is that whenever—initially or on periodic

emptying/refilling—voter registration lists are used, such lists must be updated to include all subsequent registrants to "the latest practicable date". When that is done, the Plan determines that the policy, purpose and intent of the Act will be fully accomplished by the use of such voter registration lists.

■ There was, therefore, complete compliance with the Plan,[12] and that disposes of the appeals of Crews and Blair, since the jury selection issue is the only point raised by these two appellants.

## HARRELL—MIRANDA

■ Harrell's case comes to us on the following facts. Defendant was arrested at a United States Post Office and taken to a workshop area in the post office where he was advised of his rights by the arresting Postal Inspector. In the words of the interrogating officer, "He told me that he wanted representation by an attorney; that he wanted an attorney." Nevertheless, for reasons never really explained,[13] against the explicit directions of the defendant[14] and in com-

11. See H.R.Rep.No.1076, 1968 U.S.Code Cong. & Adm.News, Vol. 2, at 1794:
"The bill specifies that voter lists be used as the basic source of juror names. These lists provide the widest community cross section of any list readily available. Census data quickly become out of date and are not suitable. The bill requires that the voter lists be supplemented by other sources whenever they do not adequately reflect a cross section of the community. The bill, as amended, provides that sources of names other than voter lists may be used to *supplement*, but not *supplant*, voter lists. (Emphasis in text)
The voting lists requirement, together with the provision for supplementation, is therefore the primary technique for implementing the cross sectional goal of this legislation."

12. We regard as wholly without merit Blair's belated contention of ineffective counsel because his court-appointed counsel, also the retained counsel for Crews, objected to being given this dual role. When asked if there was any actual conflict, this experienced advocate candid-

ly stated "I don't know that there is any real conflict" then went on to say "I just think it is bad trial practice as an attorney." As the pudding's proof this knowledgeable counsel formally moved this court to permit Blair "to adopt the brief and all documents" of Crews since the cases were consolidated for trial and "the question of law involved . . . is the same . . .".

13. The Postal Inspector's answer is simply that the defendant "didn't request the use of a phone." That excuse ignores the plain wording of *Miranda*. " '[I]t is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend upon a request.' This proposition applies with equal force in the context of providing counsel to protect an accused's Fifth Amendment privilege in the face of interrogation." *Miranda*, *supra*, 384 U.S. at 471, 86 S.Ct. at 1626.

14. The Postal Inspector testified,
"THE COURT: Well, didn't he indicate to you that he wanted the attorney present before any questioning took place?

plete disregard of the express language of the Supreme Court's *Miranda* [15] decision, the interrogating officer persisted in questioning Defendant for more than an hour, eliciting incriminating information which was later introduced at trial over Defendant's objection.

The language of the Supreme Court in *Miranda* could hardly have been more uncompromising. "If [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking *there can be no questioning.*" *Miranda, supra*, 384 U.S. at 445, 86 S.Ct. at 1612 (emphasis added). "The right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." 384 U.S. at 469, 86 S.Ct. at 1625. "Any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. * * * "If the individual states he wants an attorney, *the interrogation must cease until an attorney is present.*" 384 U.S. at 474, 86 S.Ct. at 1628 (emphasis added).

■ The Government attempts to overcome this unqualified pronouncement by arguing that since the defendant was once made initially aware of his right to be free from self-incrimination, when he chose to talk thereafter, he knowingly and voluntarily waived his Fifth Amendment privilege. This argument flies in the face of the express language of *Miranda*. "A valid waiver will not be presumed simply from * * * the fact that a confession was in fact eventually obtained. * * * The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything else is not waiver." 384 U.S. at 475, 86 S.Ct. at 1628.

THE WITNESS: Yes, I would say yes, because he said, 'I have my own attorney and I want my attorney when I—.'" (TR 142–46).

Moreover, this Circuit has squarely faced and rejected the Government's theory on several previous occasions. See United States v. Ramos, 5 Cir., 1971, 448 F.2d 398; United States v. Phelps, 5 Cir., 1971, 443 F.2d 246. See also United States v. Nielsen, 7 Cir., 1968, 392 F.2d 849. Cf. United States v. Hopkins, 5 Cir., 1970, 433 F.2d 1041; United States v. McDaniel, 5 Cir., 1972, 463 F.2d 129.

Although all of this follows directly from *Miranda*, it was also the clear holding of *Escobedo*.[16] For, as Justice White there pointed out, "At the very least the Court holds that once the accused becomes a suspect and, presumably, is arrested, any admission made to the police thereafter is inadmissible in evidence unless the accused has waived his right to counsel." Escobedo v. Illinois, 378 U.S. at 495, 84 S.Ct. at 1767 (White, J., dissenting).

Nor is the Government aided by pleading "harmless error" in the case. In the first place, the question of harmlessness is severely undermined by the Government's vigorous contest of the Motion to Suppress. If it really did not matter anyway, surely the Government would have consented to its suppression rather than risking a reversal later and new trial on what it must surely have recognized was a tenuous argument at best. Moreover, it is apparent that the error was substantial in this case in that it provided the Government with a key link in the evidentiary chain of proof. Far from "innocuous," as the Government urges, the evidence was highly prejudicial.

■■ Finally, excusing this sort of official disregard of Supreme Court pronouncements can hardly be expected to effectuate the beneficial prophylactic result intended by exclusionary rules. Illegal police interrogations can hardly be deterred if we close our eyes to official

15. Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

16. Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

indifference in the name of harmlessness. To do so would be to eviscerate the holding of *Miranda* that "the requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." 384 U.S. at 476, 86 S.Ct. at 1629.

Therefore, Harrell's conviction must be reversed and his case remanded for a new trial.[17]

### DUNN—RULE 11

As failure to comply with *Miranda* requires reversal of the conviction of co-defendant Harrell, failure to comply with Rule 11[18] renders this conviction invalid, unless on the limited remand ordered it is shown with requisite certainty that the court adequately informed Dunn of the maximum penalty.

The transcript of the plea hearing in this case shows that the Trial Judge did not expressly inform defendant of the maximum penalty which could result from his nolo contendere plea. Nor is there anything else in the record which compels the conclusion that Defendant's plea was entered with a full understanding of its consequences. On the contrary, Defendant insists that he was laboring under the misapprehension that he would be placed on probation if he pleaded nolo contendere.[19]

To begin at the beginning, a plea of guilty is invalid unless voluntarily and knowingly entered. Machibroda v. United States, 1962, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473; Von Moltke v. Gillies, 1948, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309; Waley v. Johnston, 1942, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302. A "knowing" guilty plea means, among other things, that the Defendant understands the consequences of the plea. Trujillo v. United States, 5 Cir., 1967, 377 F.2d 266, 268; Meaton v. United States, 5 Cir., 1964, 328 F.2d 379, cert. denied, 1965, 380 U.S. 916, 85 S.Ct. 902, 13 L.Ed.2d 801. Obviously the maximum possible penalty for the offense is one of the most important consequences of a plea of guilty. Hill v. United States, 5 Cir., 1971, 452 F.2d 664; United States v. Perwo, 5 Cir., 1970, 433 F.2d 1291; Marvel v. United States, 1965, 380 U.S. 262, 85 S.Ct. 953, 13 L.Ed.2d 960, affirming 5 Cir., 335 F.2d 101; Tucker v. United States, 5 Cir., 1969, 409 F.2d 1291. That a plea has been made with full understanding of the consequences must appear affirmatively from the record. McCarthy v. United States, 1969, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418. Therefore,

---

17. The holding of this case makes unnecessary consideration of the other points urged by Harrell. However, since this case must go back for a new trial, we would remind the Government that cross-examination regarding previous convictions, although proper for impeachment purposes where the Defendant has taken the stand, must be carefully conducted lest, by overemphasis of the prior conviction, it unduly prejudice the jury with a suggestion that Defendant has a propensity to commit criminal acts. Similarly, we are confident that the Trial Court will prevent undue emphasis on the Defendant's association with "professional burglars" or known criminals, particularly where no predicate has been laid for such pronouncements and they serve merely, primarily or unnecessarily prejudicial purposes.

18. F.R.Crim.P. 11.

19. Unlike the typical case in which this type of assertion can be easily dismissed because the Defendant has denied any promises of leniency or other inducements during the Rule 11 proceeding, the Trial Court made no such inquiry in this case.

Though we do not decide this case on the plea bargain aspect, it is relevant to a determination of whether or not the record indicates that the Defendant knew the maximum penalty for the offense charged that his attorney at that time has since been disbarred for "untrustworthiness" and that a previous case handled by the same attorney was reversed in a Florida state court because the attorney had made similar misrepresentations which induced that Defendant to plead guilty.

failure to inform the Defendant of the maximum sentence [20] that may be imposed as a result of his plea vitiates its efficacy.[21] *Hill, supra; Tucker, supra;* Fortia v. United States, 5 Cir., 1972, 456 F.2d 194; Berry v. United States, 3 Cir., 1969, 412 F.2d 189; Durant v. United States, 1 Cir., 1969, 410 F.2d 689; Combs v. United States, 9 Cir., 1968, 391 F.2d 1017; Pilkington v. United States, 4 Cir., 1964, 315 F.2d 204; Marshall v. United States, 7 Cir., 1970, 431 F.2d 355.

Under Rule 11 the Trial Court is required to address the Defendant personally regarding the consequences of the plea. *Lane, supra.* And the informed nature of the plea must appear affirmatively from the record. *McCarthy, supra.* This record does not expressly show in any way that Dunn had knowledge of the maximum penalty for the offense and his conviction must therefore be reversed unless on the remand it is established that the record with requisite certainty clearly reflects that he was so informed.[22]

The burden is on the Government to establish the requisite certainty, and failing that, the conviction must be set aside to allow Dunn to plead anew. *McCarthy, supra.*

Affirmed as to Blair and Crews.

Reversed and remanded as to Harrell.

Remanded as to Dunn.

20. A distinction should be made at this point between a total failure to inform about the consequences of a guilty plea and an error in informing. In the former case (the one involved in this appeal) the record affords no basis for determining whether or not the plea was made with an understanding of its consequences. In the latter case, so long as the consequences which actually resulted from the plea were not more dire than the defendant had been led to believe they could be, the record allows an evaluation of whether or not the misinformation induced a plea which would not have been entered had the defendant known the actual maximum penalty.

Where the defendant has been misinformed as to the maximum penalty, this Court's en banc decision in United States v. Woodall, 5 Cir. (en banc), 1971, 438 F.2d 1317, cert. denied, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712, establishes an approach of case by case evaluation to determine whether the prospect of different punishment would have caused a change in the plea. As Judge Thornberry explained in his special concurrence to Barton and Parry v. United States, 5 Cir., 1972, 458 F.2d 537 the Woodall Court, in overturning Stephen v. United States, 5 Cir., 1970, 426 F.2d 257, and Grant v. United States, 5 Cir., 1970, 424 F.2d 273, replaced the automatic reversal rule of those cases with a "weighing operation," whereby "each individual case must be determined on its own facts, based on whether under all the circumstances the incorrect sentencing information had an effect *at the time of the plea* on the defendant's decision to plead guilty." 458 F.2d at 543 (emphasis in original). See also Johnson v. Wainwright, 5 Cir., 1972, 456 F.2d 1200, 1201.

21. If the failure to follow the requirements of Rule 11 is raised on direct appeal, the conviction must be vacated automatically, and the Defendant given the opportunity to plead anew. *McCarthy, supra.* If the error is asserted in a post-conviction collateral attack, failure to follow Rule 11 will usually require an evidentiary hearing into the question of whether or not the defendant learned the maximum penalty from any source with the burden of proof on the Government. Lane v. United States, 5 Cir., 1967, 373 F.2d 570; Fortia v. United States, *supra;* United States v. Woodall, 5 Cir. (en banc), 1971, 438 F.2d 1317.

22. The Government's answer to this case is its assertion that Dunn was informed of the maximum penalty through the indictment which was read to him.

The indictment does not in the formal body so state. But in the upper right corner of the indictment the maximum permissible penalties are typed in.