LEIGH M. CLARK, Retired Circuit Judge.
Appellant was convicted of murder in the first degree of Violet Lence Roberts, his wife. They had been married approximately two years. During a large part of that time their marital relationship was stormy. There is no contention on appeal that the evidence was not sufficient to support the verdict of the jury. We are clear to the conclusion that there is no reasonable basis for such a contention, even though mystery to some extent hovers over the undisputed facts and circumstances. Seldom, in real life or in fiction, have they ever been so macabre. We merely summarize some of them that may be needed for the purpose of a better understanding of the only issue raised by appellant, and the reasons for the judgment of this court as hereafter shown.
According to the testimony of William Howard Metcalf, who was then employed with the Houston County Bridge and Road Department, he was operating a motor grader in the vicinity of Highway 231 in Houston County, on January 22,1979, a few miles south of Dothan, when something yellow lying in a field attracted his attention. He stood up and observed the outline of a human body. He immediately called for help, which call was relayed to the Sheriff’s Department. According to other undisputed evidence, law enforcement personnel arrived promptly at the scene of the body. They found the body of a white female, apparently about forty years of age, wearing a peach-colored blouse and a pair of yellow slacks. Her head had been bludgeoned, and she had been stabbed in the back ten or eleven times. A state toxicologist and death investigator of the Alabama Department of Forensic Sciences came to the scene before the body was removed. He performed an external autopsy of the body before its removal; thereafter, at the morgue he performed an internal autopsy. His conclusions were stated on trial that he observed partial rigor mortis for the first time at 11:15 A.M. when the body was at the morgue and full rigor mortis by 3:00 P.M. He said that there were eleven stab wounds in the back and that her skull had been fractured into various small pieces. Some of the stab wounds had entered the left lung, and one had punctured the liver. He said she died either from the stab wounds or the blows upon her skull. There were other wounds about the body.
News of the finding of the obviously murdered body was diffused promptly and extensively by the usual media, which included an appeal from the law enforcement authorities that they be informed by anyone who could identify the body. The body was not identified until it was viewed by the mother of the victim on January 29, 1979. *304 On the same day, officers, equipped with a search warrant, searched the apartment of defendant and the victim. It was found that there had been recent painting, particularly a part of a couch, with black paint. There was a paint bucket in the apartment. Various tools were found in the apartment. Many of the contents of the apartment were examined by a criminalist with the Alabama Department of Forensic Sciences, a specialist in serology, who testified that as to many of the items the tests made by her were negative as to the presence of blood, but they were positive as to a part of the fabric from the living room sofa or couch, a hunting knife, a claw metal-handled hammer and paper from a waste basket in the bathroom.
The mother of the victim, who lived in Key West, Florida, testified that defendant had brought Mrs. Roberts by automobile to the mother’s home about January 6, 1979, left her there to visit her mother, returned to Key West in about two weeks, then left with his wife to return to Dothan on January 21 at about 7:00 A.M. She said that about 7:00 P.M., defendant called her and told her of their arrival at Dothan. She said she asked for Violet, and he told her that she was bringing in her plants on account of the cold. She said also that he called her on the telephone on January 24 and on January 25, telling her on January 24 that Mrs. Roberts was “Okay” and on January 25 that he had taken her to a doctor, that she had a stomach virus.
There was evidence that defendant was at work on Monday, January 22, 1979, and that he was in Dothan until the latter part of that week, but that thereafter, he was elsewhere for weeks until he was returned . from Brenham, Texas, to answer the charge of murdering his wife. At Brenham, he was operating a grey Chevrolet owned by his wife. Pictures were taken of the tread of a tire of the automobile and of the tire tracks of an automobile that led to the body of the victim as it was found on January 22 in the field near Highway 231. The pictures were introduced in evidence. They bear a striking resemblance. Tools and various items from the automobile were tested for blood. The tests were negative. Among the items in the trunk of the automobile were a room deodorizer and a leather sheath commonly used for carrying a hunting knife.
As shockingly incredible as the circumstances stated are as to the murder of Mrs. Roberts, particularly as to what happened to her a short time before her body was found, they are “incredible” in the weakened sense only of the word, that is, extremely extraordinary or unusual. They call to mind what was said by the Old Man outside the castle the morning after the night of the bloody murder of King Duncan:
“Threescore and ten I can remember well;
“Within the volume of which time I have seen
“Hours dreadful and things strange; but this
“Hath trifled former knowings.”
Macbeth, Act II, Scene II
Defendant did not testify, but his extraordinarily lengthy statements in question and answer form, were admitted in evidence over his objection and notwithstanding his motion to suppress, which was denied. It is to this action of the trial court that the only issue raised by appellant is addressed and to which we now direct our attention.
Soon after the identity of the murdered woman had been established on January 29, 1979, a warrant for the arrest of defendant for the murder was procured. Soon after officers learned of defendant’s whereabouts in Brenham, Texas, they went to Brenham and interviewed him while in custody there. The officers from Alabama who questioned him were Houston County Sheriff A. B. Clark, Lieutenant Joe Pitts and District Attorney Mike Brown. A statement was taken from him on February 14 at Brenham, another statement on February 15 at Bren-ham, and on February 20,1979, a statement was taken from him at Dothan, Alabama. The record shows that all three of the named officers participated in the question *305 ing of defendant in both statements in Brenham and that Sheriff Clark and Lieutenant Pitts conducted the interrogation in Dothan. The combined statements constitute eighty-nine pages of the transcript. They are shown twice, once on the hearing of the motion to suppress and the other on the trial of the case before the jury. Perhaps the core of the basis of appellant’s contention that the trial court was in error in admitting defendant’s statements, which unquestionably included many inculpatory admissions but which did not contain a confession, can be best summarized by the following quotations from appellant’s brief:
“We admit the Defendant was given the Miranda warnings. (R. 113) Several times as a matter of fact. But the record clearly shows he changed his mind several times, requested an attorney, and yet was led back into the labyrinth of questioning by the officers present at the three sessions.
“At the hearing on the Motion to Suppress, Assistant District Attorney Mike Brown read from Defendant’s statements. Five times the Defendant asked either to stop the questioning or to have an attorney: at R. 115, R. 117, R. 118, R. 119, and R. 121.”
There is no contention that there was any variance between the contents of that which was read on the hearing on the motion to suppress the evidence and that which was read in the presence of the jury on the trial of the case, but we think that a more ready understanding of the portions of defendant’s statements contained in the cited references to the evidence on the hearing of the motion to suppress can be obtained by considering the comparable portions of the statements as read on the trial in the presence of the jury. It appears that for that good reason appellant’s counsel quotes a portion of the official transcript of the evidence on the subject as read on the trial in the presence of the jury. We now follow that method, by quoting therefrom not only that which appellant quotes in his brief, but also some of the context of such quoted material.
After lengthy evidencé as to the oral and written waiver by defendant of his constitutional rights against self-incrimination and to the benefit of counsel at the expense of the prosecution, and a plenary showing that defendant voluntarily, intelligently and understanding^ was willing to make a statement as to his statement on February 14,1979, the transcript shows the following:
“Pitts: Having those rights in mind, do you wish to talk to us at this time?
“Roberts: With the right to refuse to answer any question, yes, sir.
“Pitts: All right. Now, in order for us to go ahead and talk to you at this time, you have to waive your rights that I have read. And the waiver states as such. I have read or had read to me [Thereupon Mr. Pitts read to the defendant from his signed waiver, including his statement therein ‘and, I am willing to make a statement or answer questions. I do not want a lawyer at this time. I understand and know what I am doing.’]

“Brown: Okay. And you are willing to talk to us? Is that correct?
“Roberts: To a certain point, with the right to refuse to answer certain questions without a lawyer being there.
“Clark: And, I did tell you the charge is Murder, First Degree?
“Roberts: Yes, sir.
“Brown: Are you saying that you are willing to answer certain questions and you will tell us which ones you don’t want to answer? Is that correct?
“Roberts: Yes, sir.
“Brown: At any time you want to stop the questions, do you understand that you are entitled to do so and tell us that you understand that, Clarence?
“Roberts: Yes, sir.”
The quoted material is as to one of the times that appellant says the defendant asked “either to stop the questioning or to have an attorney.” Another time was after nine pages of questions and answers in the February 14 statement that pertained to what occurred when defendant said he went to his apartment about 11:00 A.M. on *306 Monday morning, January 22, 1979, after having been told by his landlord that some wires were cut at the apartment, as shown by the following:
“Brown: Okay. Did you go outside any?
“Roberts: Yes, sir.
“Brown: All right. Did you enter through the front door?
“Roberts: Yes, sir.
“Brown: Did you use your key to get in?
“Roberts: Yes, sir.
“Brown: Okay. What happened when you got inside?
“Roberts: I don’t want to talk about it now.
“Brown: You don’t want to talk about that? Okay. But you are willing to answer other questions, is that correct?
“Roberts: Yes, sir.
“Brown: All right. When you are willing to pick it up from there?
“Roberts: When I have a lawyer present and after I talk to him.
“Brown: You don’t want to answer any further questions?
“Pitts: What he is saying is excluding that part of it, is there anything you want to pick up and give us a statement concerning other than that particular part? Or, would you pick up at a later date, you know and-
“Roberts: All right. Well, the Tuesday.
“Pitts: Okay.
“Roberts: I got in my car, the Chevelle to go home.
“Brown: But, you are willing to go ahead and answer questions?
“Roberts: Yeah.
“Brown: Okay. You don’t have -—
“Roberts: As far as anything besides the apartment.
“Brown: You don’t want a lawyer present for that, do you?
“Roberts: No, sir, I will just tell you what happened to me after that.
“Brown: Okay.”
Thereupon for about eight transcript pages there were questions and answers without any interruption and without any apparent desire for a lawyer until after the following:
“Roberts: . . But, I did not kill her.
“Brown: Okay.
“Roberts: And I figured whoever killed her was after me. I did not sleep for four damn days.”
At that point, defendant made a long statement about another case in which he referred to the prosecutor in the other case in Montgomery. There was some uncertainty as to the name of the prosecutor. The transcript continues as follows:
“Roberts: No, sir. Wasn’t it an Evan something? Seems like it was, I can’t remember.
“Clark: Seems like it was. I can’t remember. Clarence, let me ask him this, see? You even talked to some of your friends about moving that couch out. And about borrowing his truck and I want you to level with yourself. I think you would feel better for your own friend has told, you know, on Monday you were going to borrow it and haul the couch out. Then he told you that he would help you on Thursday and he didn’t and you went to his place on Saturday afternoon. And he was going to help you carry that couch out, destroy the couch. So I am just talking to you, do you want to level with us? Don’t you think you would feel better?
“Roberts: Not until I see a doctor and a lawyer, no. Because, I can’t sort it out no more.
“Clark: Well, you came up Sunday night and of course, what your story is pretty much so is what we know. Then you went back there you see, and you went to work and all that stuff, see we trailed you all week. And, I know where you went on Friday and I know where you went on Saturday and —
“Roberts: We were going to Tallahassee that weekend.
“Clark: Yeah, you were down Saturday night.
“Brown: Well, Clarence, you are still willing to answer questions, what ques *307 tions you want to answer without a lawyer present?
“Roberts: Yeah.
“Brown: You are willing to do that, is that right?
“Roberts: Yeah.
“Brown: Okay. —-
“Roberts: I want some coffee though.
“Brown: Well, let’s just stop, Sheriff and see if we can get him some coffee.
“Pitts: Okay, Clarence. We got the tape back now. Okay. Now what has transpired is changing over the tape. We have a cup of coffee and we have ordered some sandwiches to eat and basically that’s the main thing that has happened? Correct?
“Roberts: Yes, sir.
“Pitts: All right. Now I want you to go ahead and continue now. Mike, you have, you have a question?
“Brown: Let’s go outside a second. Let a deputy come in here with Clarence a second. I want to talk to y’all for a second.
“Clark: Okay. Drink your coffee there.
“Brown: Okay. We are back on the tape now, Clarence, right?
“Roberts: Yes, sir.
“Brown: Okay. All right. Now, do you want to answer any more questions or would you rather stop right here, keeping in mind all the rights that Mr. Pitts and, Lt. Pitts and Sheriff Clark have advised you of.
“Roberts: If I don’t answer the question, I am not going to answer it.
“Brown: Understanding all of those rights, are you willing to make your own decision I suppose to answer which questions you want to and which questions you do not want to? Understanding that we will stop at any time that you request us to do so or ask us to do so.
“Roberts: Yes sir.”
Thereafter, the interrogation and answers continued uninterruptedly and without any reference to a lawyer, until the following:
“Brown: Okay, Clarence. Did you ever, when you went back in your apartment, I guess it was on Monday, see any blood in there?
“Roberts: I don’t want to answer that question without a lawyer.
“Brown: You don’t think it would be a good thing to stop?
“Clark: Yeah.
“Pitts: Okay, time is 6:00.
“Brown: Clarence, you have answered all these questions you have wanted to freely and voluntarily, haven’t you?
“Roberts: The best I could, yes sir.”
Two other instances apparently relied upon by appellant were while he was making a statement on February 15, contained in the transcript as follows:
“Clark: And, let me ask you this, Clarence. Did you see any blood on that couch?
“Roberts: I won’t answer that question without a lawyer.

“Clark: What did you think when you went in the house Monday morning and she was gone? What did you think? You knew she didn’t have no car.
“Roberts: Like I said, I won’t talk about anything about Monday morning until I see my lawyer.”
We think the foregoing quotations from the statement set forth the substance of all that transpired between the defendant and his questioners on February 14 and 15 that appellant construes as a request by defendant that he either be provided with a lawyer or that the questions be stopped. The last reference to the matter of a lawyer in any of the three-part statement is to be found in the statement of February 20, 1979, while defendant was interrogated in Houston County, Alabama. It is near the end of that statement and is as follows:
“Pitts: Robbie, the Sheriff asked you this two or three different times and each time you wanted to talk to a lawyer before you answered it, which you have got the right to. Ain’t nobody here going to violate that right. I want to ask you again and if you still feel that way, okay. And whatnot [sic]. Do you remember *308 going into the apartment where y’all lived and seeing blood in there?
“Roberts: It is the same answer as before.
“Pitts: Okay.”
Perhaps the quoted question of Lt. Pitts evinces to some extent that Sheriff Clark persisted in asking defendant as to what he saw when he went in the apartment on January 22, 1979, after he had declined to answer such a question in the absence of an attorney representing him. Without approving any repetition of questions the accused had declined to answer in the absence of a lawyer, we do not find that Sheriff Clark intentionally endeavored to thwart the determination of the accused not to answer such questions in the absence of a lawyer. On the other hand, it appears to us that the repeated questioning of the accused on the particular point was to be sure of a correct understanding by the questioner of the precise area of the information sought that defendant was not willing to reveal without a lawyer.
If any of the questions addressed to defendant are to be construed as efforts to get defendant to converse in the area in which he had declined to converse in the absence of a lawyer, such efforts were unsuccessful. He maintained stony silence as to that area during all of the three periods of time, February 14, February 15 and February 20, in which his written statements were taken. He never once indicated at any time before the completion of the three-part statement that he wanted a lawyer. The unusual, if not unique, way in which the interview was processed, that is, by exuberant answers by accused as to many large fields of inquiry, with the understanding that he would answer no questions without a lawyer in a particular limited field, was a creature of defendant’s own mind and dictation.
Appellant takes the position, and strongly fortifies it by authorities, that interrogation must cease when the accused requests an attorney. He largely relies upon Miranda v. Arizona, 384 U.S. 436, 444-445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, in which it is stated:
“. . . If, however, he indicates in any manner and at any state of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any other inquiries until he has consulted with an attorney and thereafter consents to be questioned.”
The stream of the stated principle is deep and broad, but it has a bottom that should not subside and banks that should not overflow. We do not find that defendant, indicated “in any manner and at any stage of the process that he wishe[d] to consult with an attorney before speaking.” On the contrary he made it clear that he did not wish to consult with an attorney before speaking. He was positive that he was willing to talk before consulting an attorney and that he was willing to answer all questions before consulting an attorney, except questions in a particular area that he clearly revealed, and thereupon such sanctuary was not invaded. He never refrained “from answering any further inquiries until he had consulted with an attorney.” He exercised “the right to refrain from answering” some “further inquiries until he ha[d] consulted with an attorney” and that right was not violated.
Appellant captions his entire argument as follows:
“MUST INTERROGATION CEASE WHEN THE ACCUSED REQUESTS AN ATTORNEY?”
We have no difficulty in answering the captioned question in the affirmative. We find it extremely difficult to follow the apparent contention of appellant that defendant requested an attorney and that thereafter the interrogation did not cease. It is to be seen from quotations from the transcript that defendant never definitely *309 and unconditionally stated that he wanted an attorney. As appellant suggests, he did make known at least five times that he would not answer some questions without an attorney. On the other hand, he made it absolutely clear that he was willing, and to some extent it appears that he desired, for questions to be asked him and that he be given the opportunity, which he was given, to answer questions and set forth fully, without any restriction whatever, all that he wanted to say in connection with the investigation.
The eases cited by appellant fully support the proposition that inculpatory statements of an accused cannot be admitted in evidence until there is an affirmative showing that he has voluntarily, intelligently and understandingly waived not only his right against self-incrimination, but also his right to counsel, at the expense of the prosecution; they also support appellant’s contention that when the accused requests an attorney, further questioning must cease. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); United States v. Biair, 470 F.2d 331 (5 Cir. 1972); United States v. Priest, 409 F.2d 491 (5th Cir. 1969).
In United States v. Blair, it is shown that the accused said, “I have my own attorney, and I want my attorney when I — .” 470 F.2d at 338. In United States v. Priest, when the standard form containing the Miranda warning was given accused, he said “He did not want to sign the form until he had consulted with his attorney.” 409 F.2d at 492. In Maglio v. Jago, 580 F.2d 202, 206 (6th Cir. 1978), also relied upon by appellant, defendant had expressed a desire for an attorney by the statement, “Maybe I should have an attorney.” He was told he couldn’t have an attorney until the next morning, and then after further questions, he orally confessed the murder.
By analogy to none of the authorities cited by appellant can it be said that defendant requested and was refused the services of an attorney. The record shows affirmatively that he was handed the standard form containing the Miranda warnings before any questions were asked him and that he expressly said at each time that “He didn’t want an attorney.”
Whatever valid criticism appellant may have as to the lengthy and ramified and voluble interrogations of accused, it does not correctly include the charge that he was denied any asserted right to an attorney. On the contrary, his right to an attorney was fully made known to him, and he voluntarily, intelligently and understandingly waived his right to an attorney prior to any and every statement made by him. The reason he preferred not to discuss a particular area remains a mystery. It is conceivable that he hurt himself by declining to answer, without any attorney, questions pertaining to that area. This being true, he could have well moved for an exclusion from the consideration of the jury those parts of the interview as to which he exercised his Fifth and Sixth Amendment privileges, and the court could well have excluded them. We cannot say that his declination to answer some of the inquiries in the absence of an attorney was not calculated to help him with the jury. Probably no one knows better than he. He made a deliberate choice as to what he should say and what he should not say without an attorney. It is obvious that the prosecution would have preferred for him to have said more. Whatever effort it made for him to do so was a failure. The ruling of the trial court in denying defendant’s motion to suppress as evidence the statement made by him was not erroneous.
We have searched the record for error prejudicial to defendant and have found none. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.