**UNITED STATES of America,
Plaintiff,**

v.

**Edward J. GURNEY et al., Defendants.**

**No. 74–122 Cr. J–K.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Nov. 26 and Dec. 31, 1974.

See also, D.C., 393 F.Supp. 683.

Harvey E. Schlesinger, Asst. U. S. Atty., Jacksonville, Fla., for the United States.

C. Harris Dittmar, Jacksonville, Fla., for Edward J. Gurney.

James D. Little and Robert L. Floyd, Miami, Fla., for James L. Groot.

James M. Russ, Orlando, Fla., for Earl M. Crittenden.

Egerton van den Berg, Orlando, Fla., for George Anderson.

Alan C. Todd, Winter Park, Fla., for Joseph Bastien.

Raymond E. LaPorte, Tampa, Fla., for Wayne Swiger.

Carlton P. Maddox, Jacksonville, Fla., for Ralph M. Koontz.

## MEMORANDUM AND ORDER

KRENTZMAN, District Judge.

The Court has received evidence and heard the several defense motions in this case. By order entered October 25, 1974, it ruled on certain of them. At hearing on November 12, 1974, the Court ruled as to certain of defendants' contentions in support of their motions to dismiss the indictment. This memorandum and order is in support thereof. Decision on defendants' remaining contentions in support of their motions to dismiss and remaining motions is under advisement.

### (A) *"Special" Grand Jury, vel non?*

On August 21, 1973, a United States District Judge resident in the Jacksonville Division of this District, entered Jury Order No. 10 directing that a venire of grand jurors be drawn and summonsed to report on September 5, 1973. The order makes no mention of the word "special." Excerpts of the transcript of the impanelling procedure are as follows:

"THE COURT:

All right, we're going to impanel two Grand Juries this morning, if we have enough jurors. We're going to impanel a Special Grand Jury; that's for sure. If we have enough jurors left, we're going to impanel a Regular Grand Jury." [Page 3 TR]

\* \* \* \* \* \*

"This Special Grand Jury will require more service by Jurors than the

Regular Grand Jury. The Regular Grand Jury that we have now has averaged two days a month meeting for the last eleven or twelve months. It is contemplated that the Special Grand Jury will serve for approximately a year and will meet more frequently than the Regular Grand Jury." [TR 4].

Thereupon the judge impanelled two grand juries designating one as "Regular" and the other as "Special", jointly instructing them as to their duties and responsibilities. For ease in reference the grand jury designated by the judge as "Special" will be called Grand Jury "A" herein.

The evidence indicates that in his record keeping activities for the two grand juries the Clerk designated Grand Jury "A" as "Special", and further indicates that in addition to this case Grand Jury "A" returned approximately twenty other indictments concerning other defendants and other alleged crimes.

Procedure by and before a federal grand jury is contained in Rules 6 and 7, Federal Rules of Criminal Procedure, which have been substantially in their present form since 1946.

In 1970, Chapter 216 §§ 3331–34 inclusive, Title 18, United States Code, was enacted. It authorizes the summons of Special Grand Juries, provides for their powers and duties, and authorizes them to submit reports. Section 3331 [supra] in pertinent part is as follows:

§ 3331 Summoning and term

"(a) In addition to such other grand juries as shall be called from time to time, each district court which is located in a judicial district containing more than four million inhabitants or in which the Attorney General, the Deputy Attorney General, or any designated, Assistant Attorney General, certifies in writing to the chief judge of the district that in his judgment a special grand jury is necessary because of criminal activity in the district shall order a special grand jury to be summoned at least once in each period of eighteen months unless another special grand jury is then serving. . . . ."

The evidence in this case establishes, and the Court finds, that there was no request or certification from the Attorney General or person in his office with regard to Grand Jury "A", it was not called by the Chief Judge of this District and at that time there was a Chapter 216 grand jury at Tampa in the Middle District of Florida. There is nothing in the record to indicate that any attempt was ever made to comply with the requirements of Chapter 216 in the calling of Grand Jury "A" and none was required. Upon such findings any issue as to the number of inhabitants of the district as of the pertinent date is irrelevant.

Defendants urge these facts as grounds for their motion to dismiss. The government urges them as evidence that Grand Jury "A", despite the nomenclature used, was not a Chapter 216 grand jury.

Grand Jury "A" had both the authority and the viability to return the indictment in this case under the provisions of Rule 6. None of its acts or attempted acts was similar to those solely authorized under Chapter 216.

There are many cases which use the word "special" to classify Rule 6 Grand Juries used for different purposes. United States v. Brown, 36 F.R.D. 205 (D.C.D.C.1964); Petition of A & H Transportation, Inc., 319 F.2d 69 (4th Cir. 1963) [to investigate possible antitrust violations]; and United States v. Fein, 370 F.Supp. 466 (E.D.N.Y.1974) [to consider antitrust and FHA matters].

In United States v. Fein, *supra,* a "special" Grand Jury was impaneled under Rule 6, Federal Rules of Criminal Procedure, first for antitrust matters, and subsequently for FHA matters. This Special Grand Jury returned an indictment 9 days after its 18 month term expired. Several weeks before under

provisions of Title 18, United States Code, Section 3331, the court extended the term of the Grand Jury for six months. The trial court found that the extension was invalid since the Special Grand Jury was originally impaneled under Rule 6 and not Section 3331, even though it was called a Special Grand Jury. The court stated at page 467:

> Nothing, therefore, indicates that the Special Grand Jury that found the present indictment was any other Special Grand Jury than one created under Rule 6(a) and (g) as the order itself sets forth. In consequence, its term was limited by Rule 6(g) to 18 months.

Denying motions to dismiss in recent cases, United States v. King, 28,264, and United States v. Duthie, 28,265, F.Supp. (D.C.W.D.Ky.1974) the district court there held:

> "While Judge Gordon, in his orders empanelling the two antitrust grand juries may have referred to them as "special" grand juries, and while the Clerk and this Court may also have followed that nomenclature, this Court is of the opinion that this was done so as to distinguish between the first grand jury which had been empanelled in 1971 in Louisville and the antitrust grand jury. This opinion is buttressed by the fact that the United States, acting through Will Wilson, Assistant Attorney General, on March 13, 1971, requested Judge Gordon, in writing, and pursuant to the Organized Crime Control Act of 1970, for the empanelling of a special grand jury because of criminal activity in the district. This letter is evidence of the fact that the Government knew how to properly request the Chief Judge for the empanelling of an organized crime special grand jury when this was appropriate."

Grand Jury "A" was not a Special Grand Jury as defined and authorized under Chapter 216, Sections 3331–34, inclusive, Title 18, United States Code. Defendants' motions to dismiss on this ground should be and they are, respectively, Denied.

## (B) ALLEGED APPEARANCE BEFORE THE GRAND JURY OF UNAUTHORIZED PERSONS

Defendants Crittenden and Gurney contend that one or more of the persons representing the government appearing before the grand jury was unauthorized so to do and urge dismissal of the indictment. Each of the other defendants adopt this contention.

In addition to the foreman the indictment was signed by persons designating themselves as follows: Harvey E. Schlesinger, Assistant United States Attorney; Bruce E. Wagner, Special Assistant United States Attorney; George A. Kokus, Special Assistant United States Attorney; Ralph J. Heikkinen, Special Assistant to the United States Attorney; and William O. Hoar, Special Assistant to the United States Attorney. The evidence indicates that each of them at one time or another appeared before the grand jury.

The parties make different contentions as to the status of those who appeared on behalf of the government. Neither contests the authority of Mr. Schlesinger who was and is an Assistant District Attorney for the Middle District of Florida. As to the others, defendant Crittenden contends that each was a "special attorney" under the provisions of Section 543(a) (post) who were not legally appointed and if they were, there was no documentation in the files of the district court to that effect. After the receipt of evidence defendant Gurney urges additionally that the appointment of Mr. Kokus expired December 31, 1973, and that between then and a second appointment on June 14, 1974, his appearance before the grand jury was illegal.

The government contends Messrs. Wagner, Kokus, Heikkinen and Hoar were each officers of the Department of Justice specifically directed by an authorized delegate of the Attorney General

to conduct grand jury proceedings and that each possesses the authority to appear before the indicting grand jury.

Among those allowed to be present before a federal grand jury by Rule 6, Federal Rules of Criminal Procedure, are "attorneys for the government." Rule 7 thereof provides that an indictment shall be signed by "the attorney for the government." There is no restriction in the local rules of this district upon the right of a duly appointed and qualified government attorney to appear before a grand jury of this district and there should be none. Careful procedure would suggest that persons so appearing should be properly identified and that internal administration within the Department of Justice should properly direct the employees thereof as to their duties from time to time. The legal issue before the Court is thus whether or not those persons appearing before the grand jury were "attorneys for the government" properly authorized and qualified.

Statutes relevant to the appointment of prosecuting attorneys for the government are as follows, all from Title 28, United States Code:

§ 515 Authority for legal proceedings; commission, oath and salary for special attorneys.

(a) The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

(b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law. Foreign counsel employed in special cases are not required to take the oath. The Attorney General shall fix the annual salary of a special assistant or special attorney at not more than $12,000.

§ 510 Delegation of authority.

The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other office, employee, or agency of the Department of Justice of any function of the Attorney General.

§ 542 Assistant United States attorneys.

(a) The Attorney General may appoint one or more assistant United States attorneys in any district when the public interest so requires.

(b) Each assistant United States attorney is subject to removal by the Attorney General.

§ 543 Special attorneys.

(a) The Attorney General may appoint attorneys to assist United States attorneys when the public interest so requires.

(b) Each attorney appointed under this section is subject to removal by the Attorney General.

§ 544 Oath of office.

Each United States attorney, assistant United States attorney, and attorney appointed under section 543 of this title, before taking office, shall take an oath to execute faithfully his duties.

§ 545 Residence.

(a) Each United States attorney and assistant United States attorney shall reside in the district for which he is appointed, except that those officers of the District of Columbia and the Southern District of New York may reside within 20 miles thereof.

(b) The Attorney General may determine the official stations of United States attorneys and assistant United States attorneys within the districts for which they are appointed.

Based on the evidence the Court finds as hereinafter set out:

(1) There appears to be no dispute and the Court finds that prior to the time of their respective appearances before the grand jury, Messrs. Schlesinger, Wagner, Kokus, Heikkinen and Hoar were and had been attorneys for the government generally and employees of the Department of Justice. In addition it is not disputed that Mr. Schlesinger was a duly appointed and qualified assistant United States attorney pursuant to the provisions of § 542(a) *supra*.

(2) Under § 543 *supra*, the Attorney General, or an employee of the Department of Justice authorized by him pursuant to § 510, may appoint attorneys to "assist United States attorneys when the public interest so requires." All persons acting under such appointment are by virtue of § 544 required to take an oath to faithfully execute his duties but, as distinguished from an United States attorney or an assistant United States attorney, is not required to reside in the district for which he is appointed.

Under § 515(a) the Attorney General or any other officer of the Department of Justice may, when specifically directed to by the Attorney General, conduct any kind of legal proceeding including grand jury proceedings, which United States attorneys are authorized by law to conduct whether or not he is a resident of the district in which the proceeding is brought. Under § 515(b) after such attorney is "commissioned as special assistant to the Attorney General or special attorney" he shall take an oath required by law.

(3) Prior to September 18, 1973, Mr. Wagner was an assistant United States attorney for the Southern District of Florida. On that date a letter bearing a signature "William J. Ruckelshaus" as acting Deputy Attorney General, appointed him as a "special assistant to the United States Attorney" for the Middle District of Florida for a period not to exceed March 31, 1974. His compensation was to be the same as that in his existing appointment and he was directed to execute the "required oath of office at his earliest convenience." There is no mention of the statute under which the appointment was being made. On September 18, 1973, he executed the oath before a deputy clerk of the United States District Court in Jacksonville. On April 10, 1974, his appointment was extended to March 31, 1975, by a letter bearing the signature of "Laurence H. Silberman" as Deputy Attorney General. The evidence establishes that Mr. Ruckelshaus had not personally signed the letter of September 18; there is no such evidence as to the signature of Mr. Silberman. The evidence does establish that Mr. A. James Barnes, a special assistant to Mr. Ruckelshaus signed Mr. Ruckelshaus' name to the letter of September 18 pursuant to authority from Mr. Ruckelshaus. It is clear and the Court finds that these were valid acts pursuant to § 510 and subpart (b), Chapter 1, Title 28, Code of Federal Regulations.

Although Mr. Wagner had already been appointed an assistant United States District Attorney for the Southern District of Florida and thus was an employee of the Department of Justice and presumably had taken an oath in that regard, it would appear that he was either "specifically directed" under the provisions of § 515(a) or "specially appointed" under that section or under § 543(a).

The use by Mr. Wagner and others of those appearing before the grand jury on behalf of the government of the words "special assistant" after their signatures on the indictment and of similar words in the respective letters to them from representatives of the Attorney General is of no help in determining their respective capacities and right to appear before the grand jury.

Whether "specifically directed" under the provisions of § 515 or appointed under the provisions of § 543, the Court finds that Mr. Wagner was duly appointed and qualified as an attorney for the government and thus legally authorized to appear before the indicting grand jury.

(4) Mr. Kokus' service in this district was the result of several communications. On June 15, 1973, Joseph T. Sneed, as Deputy Attorney General addressed him as "an attorney with the civil division of the Department of Justice: and appointed him as special assistant to the United States attorney for the Middle District of Florida for a term to expire December 31, 1973.

On October 24, 1973, a letter from Henry E. Petersen as assistant Attorney General specially retained and appointed him as a "special attorney" for a non-specified term.

On January 25, 1974, Gary H. Baise "for the Attorney General" extended his appointment as a special assistant to the United States Attorney for the Middle District of Florida to June 30, 1974. On June 14, 1974, Laurence H. Silberman, Deputy Attorney General, extended said appointment to March 31, 1975.

Each of the 4 letters provided that Mr. Kokus was to "continue to work without compensation other than that which you are now receiving under your existing appointment." The letters of January 25, 1974, and June 14, 1974, contain the enigmatic phrase "no appointment papers are necessary." Mr. Kokus executed and filed an oath of office before a judge of this court on September 5, 1973.

The court finds that from at least June 15, 1973, through the time of his last appearance before the grand jury, Mr. Kokus was continually an attorney for the government duly authorized and qualified to appear before a grand jury in this district.

(5) Although both Mr. Heikkinen and Mr. Hoar were each employees of the Department of Justice at the respective times, each received letters from Henry Petersen as assistant Attorney General, specially retaining and appointing him as a special attorney for an unspecified term without additional compensation with authority to conduct in the Middle District of Florida any kind of legal proceedings which a United States attorney could conduct. The letter to Mr. Heikkinen is dated October 5, 1973, and the one to Mr. Hoar, February 1, 1974. Each filed an appropriate oath with the Clerk of this Court in Jacksonville and each is and was appointed and qualified to appear before the indicting grand jury.

(6) Defendants respectively contend that one or more of the letters aforesaid were not on file with the clerk of this court prior to the time the respective attorneys appeared before the grand jury. While this contention is factually true, it is without merit. There are no suggestions that the letters were post-dated, that their presence in the files of this Court was required, or that their absence from the files in any way prejudiced either of the defendants.

Based on the findings and conclusions so made defendants' respective contentions that the indictment should be dismissed because of the appearance before the grand jury of the government personnel mentioned should be, and they are, respectively, Denied.

### (C) ALLEGED IMPROPER CONDUCT OF GOVERNMENT ATTORNEYS BEFORE THE GRAND JURY

In further support of his motion to dismiss the indictment insofar as it relates to him, defendant Gurney contends that he was wrongfully deprived of his constitutional rights as a result of proceedings before the grand jury.

Matters before the grand jury were reported and have been transcribed. They are subject to the secrecy provisions of Rule 6(e), Federal Rules of Criminal Procedure. Upon defendant Gurney's motion and in compliance with Rules 6(e) and 16(a) of said rules, a

copy of his testimony before the grand jury has been made available to his counsel. The limited disclosures relating thereto in this order are deemed to be "in connection with a judicial proceeding", necessary to the disposition of all or portions thereof and in compliance with Rule 6(e).

Defendant Gurney, voluntarily and at his request, appeared before the grand jury on May 13 and 14, 1974. He was informed that he was appearing before a special grand jury, informed as to the nature of the investigation, informed as to his constitutional rights, including his right to remain silent and told that the investigation had focused on him as a possible defendant. He acknowledged his desire to appear before the grand jury and executed a form waiving his right to remain silent.

Upon being offered an opportunity to make a statement to the grand jury he proceeded to make a fifty page statement.

■ Defendant contends that he was misled by being told that he was appearing before a "special grand jury", that he should not have been cross-examined and that his subsequent examination by five separate attorneys for the government was so prejudicial as to merit the dismissal of the indictment.

The memoranda of the respective parties detailed their respective contentions. The Court deems it unnecessary to discuss each of them. The Office of the United States Attorney for the Middle District of Florida is directed to make a copy of that portion of the proceedings before the grand jury relating to defendant Gurney's appearance and the Clerk is directed to file it as an "in camera" exhibit in this case to be sealed and available only for further proceedings if required.

In brief, the government urges that initially the defendant was advised that he should feel free to leave the room and hold the proceedings at any point in time [sic] the defendant felt he no longer desired to answer questions or he needed to consult with his attorney before proceeding further; that he was told before he made his statement that he would be questioned, that after he made his statement he said, "We can go now to the questions that you want to ask," and that on the second day of his appearance, after again being advised of his rights, he said that he was still willing to continue answering questions. Finally, the government points out that at the end of his appearance before the grand jury the defendant said, "Well, thank you, Mr. Prosecutors, I can't complain a bit how you treated me. You have been courteous and you tried to get at the facts and that is what you ought to do." Under all the circumstances the Court is of the opinion that defendants' contentions in this regard should be, and they are Denied.

It is so ordered.

### MEMORANDUM AND ORDER RE: JURY ACT CONTENTIONS

The defendants respectively move for a dismissal of the indictment urging that the indicting grand jury was not drawn, summoned or selected in accordance with law or the Jury Plan of this district and that the plan itself is illegal.

By order entered November 26, 1974, the Court denied defendants' contentions that Chapter 216, Title 18, U.S.C., creating special grand juries was applicable. This memorandum and order relate to defendants' Jury Act of 1968 contentions.

The Court initially received evidence and heard arguments on October 17, and 18, 1974, at which time the parties requested additional time to investigate the facts and the law and additional opportunity to brief and argue the law. A continued hearing was conducted on November 14, 1974.

Counsel for both government and respective defendants are commended for their considerable work and scholarship

in developing the facts and briefing and arguing the law.

The Court has considered the evidence, those things judicially known by the Court as will be indicated, and the law and makes this its findings and conclusions as to the contentions made.

Federal statute relating to jury selection were amended by Section 101 of Public Law 90–274, approved March 27, 1968, entitled "An Act to Provide Improved Judicial Selection Machinery for the Selection of Federal Juries and for Other Purposes." It was codified as Sections 1861–1869 inclusive, Title 28, U.S. C. In the discussion hereinafter set forth it will be referred to as "The Act."

Under Section 1863 of The Act "each United States district court (was directed to) devise and place into operation a written plan for random selection of grand and petit jurors."

A Jury Plan for the Middle District of Florida was implemented on September 23, 1968. Amendments thereto were made on April 5, 1971, July 31, 1972, and May 31, 1973. The plan, together with its amendments was received in evidence.

The plan of the district provides that for juror selection purposes the district is divided into divisions identical to those created by the general rules of the district, that management and supervision of the plan shall be separately accomplished in each of the divisions and that separate lists and wheels shall be created and maintained in each division.

The indictment in this case was returned in the Jacksonville Division of this Court by a grand jury drawn from jury wheels filled pursuant to the July 31, 1972 amendment to the plan under the management and supervision of a clerk and judge resident in the Jacksonville Division and was empanelled by a judge of that division.

Each of the seven defendants seeks dismissal of the indictment. And each adopts the contentions made by the others.

### Alleged Unconstitutionality of Portions of The Act

Citing Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), defendants urge the unconstitutionality of Section 1865(b)(1) of The Act which provides that a prospective juror is not qualified unless he:

"(1) – – – has resided for a period of one year within the judicial district;" This requirement is incorporated in and made a part of Section VIII of the Plan.

Although the Fifth Circuit Court of Appeals has approved the plans of several districts which contain this requirement it does not appear to have passed directly on this contention. It was carefully considered by the Ninth Circuit, which in a post *Dunn* decision, United States v. Ross, 468 F.2d 1213 (9th Cir. 1972) rejected the contention. For the reasons given there this Court likewise finds it to be without merit.

### Alleged Failure of the Plan to Comply with The Act

Defendants allege statutory defects in the plan on several grounds. As noted, Section 1863 of the Act directs each district court in the United States to devise and place into operation a plan "designed to achieve the objectives of sections 1861 and 1862 of (The Act), and" further directs that the Plan "shall otherwise comply with the provisions of (The Act)." Each of the Ninety-Four district courts has devised a plan and as required by said section, a copy of each plan has been filed with the Administrative Office of the United States Courts and is a public record.

Obviously, the lack of a requirement for complete uniformity is in recognition of the geographical and demographic differences and requirements of district courts as compared with each other. The requirement in said section that before becoming effective each plan was subjected to review and approval by a panel consisting of the circuit judges of the relevant circuit has contributed to

more similarity among the plans within a circuit or portions thereof. But a comparison indicates a difference among plans within the System and to a lesser degree within the Fifth Circuit. *See* plans of Northern, Middle and Southern District Courts of Florida, and report of a sub-committee, dated January 28, 1974, (of the Committee on the Operation of the Jury System of the Judicial Conference of the United States) appointed to study periodic jury reports.

■ The lack of any requirement for absolute uniformity among plans mandates that an attack on a plan on the grounds of statutory non-compliance must be considered in the light of the objectives of The Act, the population and size of the district, and the size of the master wheel requirements. *See,* United States v. Arroyave, 477 F.2d 157, 160 (5th Cir. 1973), quoting with approval from United States v. Pentado, 463 F.2d 355, 359 (5th Cir. 1972).

In United States v. Resnick, 483 F.2d 354 (5th Cir. 1973) cert. den. Nov. 5, 1973, 414 U.S. 1008, 94 S.Ct. 370, 38 L. Ed.2d 246, the Fifth Circuit considered a challenge to the Plan for the selection of jurors for the Middle District of Florida and speaking through Chief Judge Brown said:

■ We have on several occasions had to pass on whether a jury selection Plan complied with the Statute or the Plan had been violated. United States v. Blair, 5 Cir., 1972, 470 F.2d 331; United States v. Kuhn, 5 Cir., 1971, 441 F.2d 179; United States v. Pentado, 5 Cir. 1972, 463 F.2d 355; United States v. Gooding, 5 Cir., 1973, 473 F.2d 425 [1973]; United States v. Arroyave, 5th Cir., 1973, 477 F. 2d 157 [1973]. We reaffirm our pragmatic statement in Blair, supra: "In the Constitutional— statutory goal or a fair cross section Congress had the right to consider practical problems of administrative necessity." 470

F.2d at 336. *Examining the Plan in detail,* we cannot say that it fails to satisfy the statute or to afford the defendant due process. (Emphasis supplied.)

Since the alleged defects specifically urged by the defendants were not there considered, the Court will examine them here.

*The Allegation of Lack of Specificity in Procedures Directing Assignment of Names From Qualified Jury Wheel to Jury Panels.*

Sub-paragraph (b) of Section 1863 of The Act provides in part that the Plan shall:

\* \* \* \* \* \*

(2) specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivision. . . .

(3) specify detailed procedures to be followed by the jury commission or clerk in selecting names from the sources specified in paragraph (2) of this subsection. These procedures shall be designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes. They shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions. For the purposes of determining proportional representation in the master jury wheel, either the number of actual voters at the last general election in each county, parish, or similar political subdivision, or the number of registered voters if registration of

voters is uniformly required throughout the district or division, may be used.

\* \* \* \* \* \*

(9) specify the procedures to be followed by the clerk or jury commission in assigning persons whose names have been drawn from the qualified jury wheel to grand and petit jury panels.

Section 1869 of The Act provides in part: "for the purposes of this chapter (The Act) . . .

\* \* \* \* \* \*

(e) 'division' shall mean: . . . in judicial districts where there are no statutory divisions, such counties, parishes, or similar political subdivisions surrounding the places where court is held as the district court plan shall determine: *Provided*, That each county, parish, or similar political subdivision shall be included in some such division; "

The Middle District of Florida does not have statutory divisions. *See* Section 89(b), Title 28, U.S.C.

The Plan provides in part:

I. For jury selection purposes, pursuant to Section 1869(e), the Middle District of Florida is hereby divided into divisions, identical to those created in Rule One, General Rules of this Court, as follows:

A. Jacksonville division consisting of the counties of Baker, Bradford, Clay, Columbia, Duval, Flagler, Hamilton, Madison, Nassau, Putnam, St. Johns, Swannee, Union and Volusia.

B. Ocala division consisting of the counties of Citrus, Lake, Marion and Sumter.

C. Orlando division consisting of the counties of Brevard, Orange, Osceola and Seminole.

D. Tampa division consisting of the counties of Hardee, Hernando, Hillsborough, Manatee, Pasco, Pinellas, Polk and Sarasota.

E. Fort Myers division consisting of the counties of Charlotte, Desoto and Lee.

Provisions of this plan apply to all division of the district unless specifically indicated otherwise.

\* \* \* \* \* \*

III. It is the intention of this plan that management and supervision shall be separately accomplished in each of the divisions (Section I this plan). The clerk of this court, or one or more of his deputies, as directed by the clerk, is authorized to manage the jury selection process, acting under the supervision and control of the Chief Judge of this court. In the event of absence or disability of the Chief Judge, the Judge in active service and senior in commission shall serve. The Judge to whom the work of a division of this court is assigned by the Chief Judge by general order shall be in charge of the day to day operation of the jury selection process in that division (i. e., such Judge shall, as needed, order the addition of names to the wheel, the drawing of names therefrom, the granting of temporary excuses, etc.).

IV. A. Voter registration lists represent a fair cross section of the communities in the several divisions of the Middle District of Florida. Accordingly, the names of grand and petit jurors serving on or after the effective date of this plan shall be selected at random from the voter registration lists of all the counties within the relevant division.

B. The clerk or deputy clerk shall maintain a master jury wheel for each of the divisions within the district . . . .

\* \* \* \* \* \*

D. The clerk shall ascertain the total number of registered voters

for each division and divide that number by the number of names to be selected for the master jury wheel from that division. For example, if there are 660,000 registered voters in a division, that number will be divided by 6,000 producing the quotient of 110. Then he shall draw by lot a starting number which is not less than one and not greater than 110 and the name corresponding to that number shall be selected from the voter registration list of each county in that division along with each 110th name thereafter. Thus, if the starting number is 10, the 10th, 120th, 230th, 340th, etc., names shall be picked from the registration list of each county of that division. If a voter registration list of a county is not available as such, the precinct lists or other separate lists shall be combined for the purpose of implementing this plan.

\* \* \* \* \* \*

IX. The clerk shall also maintain separate qualified jury wheels or boxes, hereinafter referred to as qualified jury wheels, for each division in the district and shall place in such wheels the names of all persons drawn at random from the master jury wheels and not disqualified, exempt, or excused pursuant to this plan . . . .

\* \* \* \* \* \*

XI. A centralized grand jury in Jacksonville shall serve the Jacksonville and Ocala divisions and a centralized grand jury in Tampa shall serve the Tampa and Fort Myers divisions. A grand jury in Orlando shall serve that division. A pro rata or approximately pro rata number of names drawn at random from the qualified jury wheel of each relevant division shall be pooled to obtain the grand jury array for grand juries at Jacksonville and Tampa respectively.

◼ Defendant suggests that the plan fails to set a standard to be used by the Clerk in determining what is "pro rata." Consideration of the portions of the plan quoted *supra*, the dictionary definition and common sense understanding of "pro rata" suggest otherwise. The evidence establishes that the Clerk did understand and correctly applied the "pro rata" requirements.

### Failure of Plan to Contain Distance Limitations.

◼ Section 1863(b)(7) requires that a grand jury selection plan shall:

(7) fix the distance, either in miles or in travel time, from each place of holding court beyond which prospective jurors residing shall, on individual request therefor, be excused from jury service on the ground of undue hardship in traveling to the place where court is held.

The Plan of the Middle District does not do so. Neither do plans for the Northern and Southern District of Florida, or of any district court within the jurisdiction of the Fifth Circuit. *See* respective plans and sub-committee report, *supra*. The Court said in United States v. Gooding, 473 F.2d 425, 429 (5th Cir. 1973):

The jury selection system under attack is that detailed in The Plan of the United States District Court for the Southern District of Florida for the Random Selection of Grand and Petit Jurors, which has withstood two recent attacks before this court in United States v. Blair, 5th Cir. 1972, 470 F.2d 331 and United States v. Pentado, 5th Cir. 1972, 463 F.2d 355. A similar plan for the Northern District of Florida was upheld in United States v. Kuhn, 5th Cir. 1971, 441 F.2d 179. . . .

That court and this have and do consider the requirements of the Act and the particular area and population density

of this and other districts mentioned. Defendants' contention in this regard is also without merit.

### Alleged Modification of Plan.

 As indicated, the Act provides that modifications of a plan made at the instance of the district court shall become effective after approval by the reviewing panel of the judicial council of the respective circuit. *See,* Section 1863(a) of the Act. The plan, as approved, provides that the Jacksonville Division of the Court should consist, among others, of Volusia County, Florida. The Middle District of Florida does not have statutory divisions and as required to meet the needs of the Court it can and has from time to time redefined the geographical areas of a division. By order entered August 20, 1973, the judges of the district directed that effective September 1, 1973, Volusia County be transferred to the Orlando Division of the Court. The order also provided that:

(4) The Clerk of this Court shall transfer the names of those Volusia County residents now in the jury wheel for the Jacksonville Division to the Orlando Division for inclusion in the jury wheel at Orlando.

Prior to drawing the panel for the indicting grand jury, the Clerk complied with the order. Defendants contend that the transfer of Volusia County was a modification of the plan which should have been submitted for approval to the circuit reviewing panel. It was not so submitted. It seems clear that there was no intention in the Act to divest a district court of its right, obligation and ability to take required actions to expeditiously handle its work in the absence of a clear violation of the intent and purpose of the Act. The Court finds that the transfer was not a modification of the plan, that approval of the circuit reviewing panel was not required and that the action of the court and clerk in this regard neither prejudiced a defend-

ant nor amounted to a substantial failure to comply with the Act.

### Allegations of Lack of Strict Compliance by Court and Clerk

 Defendants claim that in several instances both the Clerk and the Court did not literally follow the requirements of the plan.

Section 1867(a) of the Act provides in part:

. . . the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of *substantial failure* to comply with the provisions of this *title* in selecting the grand or petit jury. (Emphasis supplied)

Thus it is clear that the test is whether or not there has been a substantial failure to comply with the *Act.*

As was emphasized in United States v. Ponder (5th Cir. 1971) 444 F.2d 816, a case involving an attack on jury selection, at 821:

As stated by Judge Learned Hand: "The statute confers a power which, like any other power, the court need, and indeed can, use only with approximate exactness; it is engaged, not in a scholastic exercise, but in the practical administration of justice." United States v. Gottfried, 165 F.2d 360 (2nd Cir. 1948), cert. den. 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948).

It is important therefore to remember the policy and real purpose of Congress in passing the Act. They are contained in the first two sections thereof.

§ 1861 Declaration of policy.

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for serv-

ice on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose."

§ 1862 Discrimination prohibited.

"No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status."

Except for one contention that the clerk's action led to the possible exclusion of jurors who were sole proprietors of a business, the defendants make no claim of actual prejudice and urge that a showing of actual prejudice is not required, citing: Rabinowitz v. United States (5th Cir. 1966) 366 F.2d 34, Thiel v. Southern Pacific Co. (1946) 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, and United States v. Zirpolo (3d Cir. 1971) 450 F.2d 424. While each of these contains language suggesting that actual prejudice is not required, they respectively found the existence of a systematic and intentional exclusion of a race, economic or social class or sex (women). *Rabinowitz* and *Thiel* were pre Act cases and in condemning the jury practice in *Zirpolo* the court found a patent violation of the spirit and letter of the Act. Since the administration of a court system is an art and a science, that then is the test which will be applied.

### Alleged Error in Constituting Master Jury Wheel

The July 31, 1972 amendment to the plan was for the purpose of complying with Public Law 92–269 enacted April 6, 1972, Section 1, 86 Stat. 117. The law changed the minimum age qualification for serving as a juror in federal courts from 21 years of age to 18 years of age, and required every court to refill its master jury wheels by September 1, 1973, and its qualified jury wheels by October 1, 1973. The evidence indicates that in refilling the mas-

ter jury wheel in the Jacksonville Division, after employing the procedure required by sub-paragraph (d) § IV of the plan, *supra*, the clerk obtained the names of 8,000 persons to whom qualification forms were sent. Defendants point out that sub-section (c) § IV of the plan sets 6,000 as the minimum number of names to be placed initially in the master jury wheel for the Jacksonville Division and they allege that the action of the clerk in sending questionnaires to 8,000 persons was improper and unauthorized.

At the outset it should be noted that the number of names set in the plan for initial use was the *minimum*. The plan also provides that "These numbers are as large as they are to allow for the possibility that some juror qualification forms hereinafter mentioned, will not be returned, that some prospective jurors may be exempted by law, and that some may not comply with the statutory qualifications." By the time of the 1973 refilling the clerk had experience gained from the initial filling procedure. As the court noted in *Blair, supra*, 470 F.2d at 335, note 8:

Under Part A–Threshold Questions to be Answered subpart 5—"How many names will be selected at random from the voter lists?" the Guidelines [of the Committee on the Operation of the Jury System of the Judicial Conference of the United States] stated as follows: "In determining how many names to select from the voter lists three factors must be considered: (1) The time period for which these names are to last. The Act requires the plan to fix the times when the master jury wheel must be emptied and refilled. In most cases it is anticipated this will be every 2 or 4 years. The master jury wheel will then be filled once to last this entire period.

(2) The number of jurors needed during this time period. An estimate of this figure can be made from past experience. (3) The number of persons whose names are selected from the

voter lists who it is anticipated will ultimately serve as jurors and not be disqualified, excused, exempt, excluded or fail to respond to the jury qualification form and the summons. The experiences of a few courts which have recently converted to random selection from voter lists indicate that approximately half of those whose names are picked from the voter lists will be eliminated in one way or another. Accordingly, about twice as many names must be placed in the master jury wheel as are needed as jurors during the period before the master jury wheel is emptied and refilled. It may be desirable to place even more names in the master jury wheel as a *safeguard running out of names."*

The evidence in this case amply establishes the need for the procedure followed by the clerk. It does not constitute a substantial departure from the requirements of the Act.

Defendants suggest that the procedure whereby the wheels were completely refilled over a relatively short period of time was improper and led to errors which deprived qualified persons of the right to serve as jurors. Initially it should be noted that the procedure of complete and periodic refilling is clearly sanctioned by the Fifth Circuit Court of Appeals in *Gooding, supra,* 473 F.2d at 429:

> In *Kuhn* we approved as valid under the Jury Selection and Service Act of 1968, 28 U.S.C.A. § 1861 et seq., a five year interval for emptying and refilling the jury master wheel, the master list from which grand and petit jurors are drawn, and held a lag of one year and five months between the filling of the master wheel and the time of trial to be impervious to constitutional attack. In *Pentado* we held a three year lag between the filling of the master wheel and trial to be constitutionally acceptable. In *Blair* we held the District Clerk did not fail to comply with the Plan by not adding names to the master wheel on a continuing basis

between the quadrennial emptying and refilling.

The July 1972 amendment to the plan required a complete purging and refilling of the wheels so that 18 year old persons would be able to serve on juries. Prompt action was required. The law mandated it and challenges to jury venires called attention to that fact. In addition, the evidence indicates that just prior to the refilling there was an immediate need to meet a shortage of names in the Jacksonville wheels.

▪ The plan made lists of registered voters the initial source from which the jury wheels would be filled. Registration of voters is a state function and in Florida each county has a Supervisor of Elections who maintains voter registration records. Voters' lists, or excerpts from them, obtained prior to the opening of the Books for registration by 18 years olds would have been useless. The evidence is that the earliest dates by which lists which included 18 year olds could have been obtained was October 8, 1972. The evidence is that although the clerk began his efforts to obtain the material from the 14 counties then in the Jacksonville Division prior to October, 1972 it was not all available until late December, 1972. The procedure for random selection of names was completed in January and questionnaires were mailed to prospective jurors in February, 1973. The qualified wheel was filled by early March, 1973. Under the law and the evidence in this case there is nothing about either the effect of the complete refilling of the wheel itself or the time sequence thereof that was not required or that amounts to a substantial failure to comply with the Act.

▪ Defendants contend that after the Clerk had examined juror qualification forms he determined questions of qualification and exemption without authority and judicial supervision.

Traditionally the clerk of a federal court has been an important part of its jury selection process. *See* history of

jury selection prior to 1968 in *Rabinowitz, supra*.

In response to the 1972 amendment to the plan, approved by the Circuit Reviewing Panel October 30, 1972, which required, among other things, that the wheels at Jacksonville be refilled promptly, the clerk mailed juror qualification questionnaires to 8,000 persons. Six thousand eight hundred thirty four (6,834) were returned. On the basis of information provided on the forms the clerk or a deputy clerk determined that 2,243 persons were unqualified to serve and that 145 were exempt.

Section 1865(a) of the Act provides in part:

> (a) The chief judge of the district court or such other district court judge as the plan may provide, on his initiative or upon recommendation of the clerk or jury commission, shall determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service.

Defendants urge that the chief judge of the district or a designated judge should have personally examined each questionnaire and other material returned with the questionnaires.

Neither the chief judge nor a district judge did so.

The clerk testified that the "senior presiding judge in the Jacksonville Division gave him authority to handle the jury selection process, that the standards used in reviewing the juror qualification forms were the guidelines contained in the plan plus his "twenty years of experience," that he had been working with Judge Scott, (the senior in point of service of the two judges in Jacksonville) since 1966 and that while he did not inform any judge of his actions that:

> . . . The many times and many, many hours that Judge Scott or
> . . . possibly Judge Tjoflat, were

in my office when I was working on these. Because it took a long long time, and I am sure they knew that I was either disqualifying or accepting them as prospective good qualified jurors. 189 TR Vol. 1

The Management Statistics for United States Court, 1974 prepared by the Director of the Administrative Office of the United States Courts, indicates that for fiscal year 1974 the six judges of the district operating three divisions, holding court at five places, on a per judge basis were 22nd among the 325 United States district judges in number of cases filed, 18th in complexity of cases and 9th in number of trials completed.

Neither the requirements of the law nor the evidence establishes a substantial failure to comply with the Act in this instance.

Each of the resident judges of the Orlando Division of this court has held to the same effect on this point.

In addition defendants contend that the effect of the treatment of juror questionnaire forms was such that persons whose names should have been in the wheels were improperly excused or exempted, that by excusing sole proprietors of businesses the Act was violated, and that they were thus deprived of a grand jury selected at random from a fair cross-section of the community.

Much evidence was received on this issue. Counsel were granted full opportunity to examine the clerk's records and to cross-examine him and his staff. By stipulation representative counsel for defendants and for the government made a detailed survey of the jury questionnaire forms returned for the Jacksonville Division and the Ocala Division. The survey covered 3,633 forms from the Jacksonville Division and 1,594 forms from Ocala Division for persons whose names were included in the qualified wheels for those respective divisions and a separate survey covered 1,746 forms from the Jacksonville Division and 979 forms from the Ocala Division for persons

whose names were not included in the qualified wheels for those respective divisions. Copies of the surveys and the questionnaire forms themselves were received in evidence and have been examined by the Court. As was to be expected, the various forms and the material returned with some of them by prospective jurors are in almost every possible condition of clarity or lack of it. Many persons noted a desire and intention to request excuses, but at the same time failed to request to be excused. Many stated physical reasons or practical problems which clearly indicated an inability to be effective jurors. The report does not establish an intentional and systematic effort by the clerk to deprive anyone of a right to serve on a jury. On the contrary, the evidence indicates a conscientious effort by the clerk to obtain a jury pool of persons who could serve. Much effort is expended in all courts to improve juror utilization so that trials will not be delayed or aborted, citizens will not be frustrated and upset by being required to needlessly report and court administration money is properly expended. The testimony and the evidence indicated a proper appreciation of all these and a failure to establish any substantial violation of either the letter or spirit of the Act.

■■■ The evidence indicated that on occasions sole proprietors of businesses were excused, but the evidence does not establish a deliberate exclusion of any particular economic class such as existed in *Thiel, supra.*

Section 1863(b)(5) of the Act provides that the Plan shall: "Specify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service." The Plan does not include sole proprietors among those listed. While decision as to the legality of so doing is not here required, it is interesting to note that the plans of at least thirty districts, including several in the Fifth Circuit, provide for the granting of excuses to sole proprietors.

Defendants also contend that the clerk or his deputy improperly excused persons summoned for the indicting grand jury and that at the impaneling thereof the district judge did likewise. The evidence does not establish a failure of substantial compliance in either instance.

With commendable advocacy counsel for defendants have made detailed attacks upon every possible aspect of the action by the Court and the clerk in the selection, summoning and impaneling of the grand jury. Each has been carefully considered by the court and it is of the opinion that the respective motions to dismiss the indictment should be, and each is, Denied, as to each contention made.

It is so ordered.

## ORDER ON MOTIONS FOR CHANGE OF VENUE

The indictment in this case was returned in the Jacksonville Division of this court. There are seven defendants, nine defendants' counsel and six government counsel. It has been suggested that approximately two months will be required for the trial.

Motions for change of venue have been filed and made at hearings as follows:

Defendant Gurney wishes transfer to Orlando. He alleges his permanent residence to be in the Orlando Division. His counsel resides in Jacksonville.

Defendant Groot wishes transfer to Orlando. He resides in Washington, D. C. and his counsel reside in the Southern District of Florida.

Defendant Crittenden wishes transfer to Orlando. He and his counsel reside in that division.

Defendant Anderson wishes transfer to Orlando. He and his counsel reside in that division.

Defendant Bastien wishes transfer to Orlando. He and his counsel reside in that division.

Defendant Swiger wishes transfer to Tampa. He and his counsel reside in the Tampa division.

Defendant Koontz opposes change of venue. He and his counsel reside in the Jacksonville division.

The government opposes change from Jacksonville.

Rule 18. Rules of Criminal Procedure, as amended effective July 1, 1966 provides:

Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a *district* in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses. (Emphasis supplied)

As stated in Houston v. United States, 419 F.2d 30, 33 (5th Cir. 1969):

Rule 18 does not encompass an absolute right on the part of the appellant to be tried in a division of his choice but is a discretionary power of the Court to be exercised upon a showing of good cause.

 It is clear that the "convenience of the government" is not a relevant factor to be considered, but that is not to say that the Court should not consider practical considerations and the needs of the Court to provide adequate facilities. As the Court said in United States v. Cohen, 35 F.R.D. 227, 231 (N.D.Cal. 1964), the Court must consider "what course of action best serves the interest of justice."

Counts I thru VII inclusive of the indictment will be tried initially. Count I, a conspiracy charge, alleges 115 separate overt acts. Defendants urge that discovery from the government indicates that it will call approximately 200 witnesses from all over the United States and suggest that of them 65 reside in the Orlando area, 30 reside in the Jacksonville area, and 14 reside in the Tampa area. A map of Florida was received in evidence and the geography of that state is of course well known to the Court.

Facilities designated and equipped for holding jury trials in the Middle District of Florida are located at Fort Myers, Jacksonville, Ocala, Orlando and Tampa. No party suggests that the trial should be held in Fort Myers or Ocala and distance and other considerations suggest that it should not be. Of the six judges of the district, two sit in Jacksonville, two in Orlando, and two in Tampa. The judge to whom this case has been assigned, and his staff reside in the Tampa area. There are three jury trial rooms in Jacksonville, and three in Tampa. Until recently only one judge was stationed in Orlando. The federal courthouse now in use there has one full sized trial jury room and judge's chambers and one mini-sized trial room and judge's chambers. There are no additional rooms available for judge's chambers or other areas such as would be required in this trial. The mini-sized courtroom is not suitable for a trial involving the number of defendants and counsel involved in this case. If the full-sized courtroom there were utilized for this case, at least one of the resident judges there would be required to transfer pending cases there for trial elsewhere. The inadequacy of the facilities at Orlando has been recognized in that a new federal courthouse is now under construction in Orlando with estimated date of completion set for late 1975 or early 1976.

In addition to three full-sized courtrooms and judges' chambers at Tampa, there is one additional judge's chambers and a non-jury trial room. There are adequate rooms for jurors, witnesses and conference areas for government and defense counsel respectively. Tampa is located near the geographical center of the district and is served by a modern airport with adequate daily connection flights to destinations both within and without the state and a network of interstate and state highways. There

are excellent housing and dining facilities.

Giving full consideration to the positions of the respective parties, the convenience of the defendants and the witnesses, and the furtherance of the interest of justice, the Court is of the opinion that this case should be tried in Courtroom No. 1, United States Post Office and Courthouse Building, Tampa, Florida where, as previously noticed, trial will begin January 20, 1975. To the extent the defendants urge otherwise, said motions are denied.

It is so ordered.